**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JANE DOE,

          Plaintiff,        5:18-cv-1100 (BKS/TWD)

v.

SYRACUSE UNIVERSITY,

          Defendant.

**Appearances:**

*Plaintiff, pro se:*
Jane Doe
Seoul, South Korea

*For Defendant:*
Edward G. Melvin
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Jane Doe,[1] currently proceeding pro se, brings this Section 1983 and diversity

action alleging various claims against Defendant Syracuse University relating to her expulsion

from the University in 2015. (*See generally* Dkt. No. 1). On November 16, 2018, Defendant filed

a motion to dismiss Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) or,

in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt.

---

[1] Pursuant to a Court-ordered stipulated protective order, Plaintiff Jane Doe and the individual identified in the complaint as "Student X" may proceed using pseudonyms. (Dkt. No. 11).

No. 10). On March 16, 2022, the Court dismissed all but three claims. *Doe v. Syracuse Univ.*, 2022 WL 798058, at *13–14, 2022 U.S. Dist. LEXIS 47053, at *36–37 (N.D.N.Y. Mar. 16, 2022). Plaintiff's three remaining claims are: (1) breach of contract based on Defendant's alleged failure to invite Plaintiff to participate in a pre-hearing meeting in violation of the "Syracuse University Student Conduct System Handbook 2014–2015" ("Handbook"); (2) breach of contract based on Defendant's alleged failure to resolve her claim of sexual assault in violation of the Handbook; and (3) deliberate indifference to harassment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"). *Id.* Presently before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, (Dkt. No. 106), which is fully briefed, (Dkt. Nos. 106-1, 119, 121). For the following reasons, Defendant's motion is granted.

## II.    FACTS[2]

### A.    Plaintiff's Allegations of Plagiarism & Resulting Probation

In the spring of 2015, Plaintiff was enrolled as a full-time student at Syracuse University in an integrated undergraduate and graduate program. (Dkt. No. 106-3, ¶ 5). Plaintiff graduated in May 2015 with an undergraduate degree in Fine Arts and was scheduled to graduate in May 2016 with a graduate degree in Computer Science. (*Id.* ¶¶ 5, 7).

On May 8, 2015, faculty members at the University's School of Design filed a formal complaint against Plaintiff with the Office of Student Rights and Responsibilities ("OSRR") due to "Plaintiff repeatedly making baseless allegations that fellow students and professors were

---

[2] The facts are drawn from Defendant's statement of material facts, (Dkt. No. 106-6), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007). As discussed more thoroughly below, Plaintiff has not filed a response to Defendant's statement of material facts.

stealing her design ideas." (*Id.* ¶ 6; *id.* at 46–47). Plaintiff met with OSRR Associate Director Eric Nestor on June 22, 2015, to discuss the charges against her and agreed to be "placed on a status of disciplinary probation through April 29, 2016." (*Id.* ¶ 7–8; *id.* at 50). In a letter confirming the outcome of the meeting, Mr. Nestor stated that Plaintiff consulted with her "Procedural Advisor" prior to resolving her case but "chose not to include" the advisor in the meeting. (*Id.* at 49). Plaintiff accepted responsibility for the charges of harassment, academic dishonesty, disorderly conduct, and violation of University policies, rules, or regulations. (*Id.*).

### B.    Relationship with Student X & Resulting Expulsion

In the spring of 2015, Plaintiff entered into a relationship with Student X, a third-year student at the University's law school. (*Id.* ¶ 9). Their relationship ended prior to Student X's May 8, 2015 graduation. (Dkt. No. 106-4, ¶ 4).

Plaintiff testified at her October 19, 2023 deposition that she told Dr. Carrie Brown on May 5, 2015, that Student X had sexually assaulted her. (Dkt. No. 106-2, at 7:16–23). Dr. Brown is "the Director of Counseling at the Barnes Center at the Arch, which is the hub for mental, physical, and holistic wellness for students at [the] University," and was in 2015 a Staff Therapist with the University's Counseling Center assigned to the University's Sexual and Relationship Violence Response ("SRVR") Team. (Dkt. No. 106-5, ¶ 1–2, 5). Plaintiff further testified that Dr. Brown suggested Plaintiff file a Title IX complaint against Student X and apply for a "No-Contact Order" ("NCO") against him at the University's Department of Public Safety ("DPS"). (Dkt. No. 106-2, at 11:22–12:8). Plaintiff wanted a few days "to read the SRVR Resource Book at home" and did not thereafter apply for an NCO. (*Id.* at 12:9–15, 23–13:1). Dr. Brown disputes this account. According to Dr. Brown, "Plaintiff did not tell me on May 5, 2015 that Student X sexually assaulted her; in fact, I did not learn about this until after I returned to the office on July 2, 2015." (Dkt. No. 106-5, ¶ 7).

On May 11, 2015, Student X requested an NCO against Plaintiff, alleging "that Plaintiff was engaging in harassing behavior toward him, his mother, and friends." (Dkt. No. 106-3, ¶ 10). A temporary NCO was delivered to Plaintiff the following day. (*Id.* ¶ 10; *id.* at 53). On May 13, 2015, the OSRR delivered to Plaintiff a permanent NCO, (*id.* ¶ 12; *id.* at 62), and, "[o]n May 26, 2015, Student X initiated a formal Title IX complaint against Plaintiff for stalking/harassment," (*id.* ¶ 13).[3] The University's Office of Equal Opportunity, Inclusion and Resolution Services ("EOIRS") began an investigation into Student X's complaint, and then-Title IX Coordinator Cynthia Maxwell Curtin emailed Plaintiff on June 19, 2015, to schedule a time to discuss Student X's allegations. (*Id.* ¶¶ 15–16).

On June 25, 2015, Plaintiff appeared at Ms. Maxwell Curtin's office with Tekhara Watson, a Counseling Center Therapist, and met with Sheila Johnson-Willis, (*id.* ¶ 17), who is now the University's Chief Equal Opportunity and Title IX Officer and was, during the relevant period, an EOIRS Investigator and Interim Chief Equal Opportunity Title IX Officer, (Dkt. No. 106-4, ¶ 1). Ms. Johnson-Willis states in her January 12, 2024 declaration that "[t]he first time Plaintiff complained to the Title IX/EOIRS office that she had been sexually assaulted by Student X was when she met with me on June 25, 2015." (Dkt. No. 106-4, ¶ 25; *see also* Dkt. No. 106-3, ¶ 17 (declaration of the University's Title IX Coordinator for Students stating that "[d]uring this meeting, and for the first time, Plaintiff reported that she had been sexually assaulted by Student X.")).

Ms. Johnson-Willis advised Plaintiff on the University's processes for responding to sexual assault and interviewed Plaintiff regarding her allegations. (Dkt. No. 106-4, ¶ 11). Ms.

---

[3] On May 23, 2015, and May 26, 2015, Student X reported to DPS that Plaintiff had violated the NCO. (Dkt. No. 106-2, at 70–73).

Johnson-Willis informed Plaintiff that because Student X had graduated "the University did not have jurisdiction over him under the University's student conduct system," and explained to Plaintiff "the criminal process and how to make a criminal report with the City of Syracuse Police Department [("SPD")]." (*Id.* ¶ 12). Ms. Johnson-Willis later memorialized their meeting in a four-page interview report. (*See id.* at 43–47).

Ms. Johnson-Willis completed her investigation in August 2015. (*Id.* ¶ 22). On August 13, 2015, she forwarded to the OSRR a copy of her investigation report. (*Id.* ¶ 23). The report, over one hundred pages in length, includes an "August 13, 2015 memorandum (as the cover page), the [NCO], documents from [DPS], statements taken from Student X and Plaintiff, documents and information provided to Ms. Johnson-Willis by Plaintiff and Student X, and a statement taken from a witness." (*Id.* ¶ 24).

In her January 12, 2024 declaration, Ms. Johnson-Willis states that Student X had graduated by the time Plaintiff first "complained to the Title IX/EOIRS office that she had been sexually assaulted by Student X," and, as a result, "the University no longer had jurisdiction over [him]." (*Id.* ¶ 25). Ms. Johnson-Willis continues, "there was no basis to include him as a respondent in a proceeding as part of the University's student conduct system" and, "after consultation with OSRR's Director Pam Peter, I 'amalgamated' Plaintiff's allegation against Student X into Student X's complaint against Plaintiff." (*Id.* ¶ 26).

Defendant has submitted a September 1, 2015 email to Plaintiff from Ryan Gavigan, a Student Conduct Advisor with the OSRR. (Dkt. No. 106-3, ¶ 36; *id.* at 176–77). Mr. Gavigan's email included a copy of the Handbook. (*Id.* ¶ 36). And attached to Mr. Gavigan's email was a letter dated September 1, 2015. (*Id.* ¶ 36; *id.* at 178–79). The letter begins, "[t]his is to inform you that the University Conduct Board [("UCB")] will hear the complaint filed against you by

[Student X]. The hearing has been scheduled for Thursday, September 10, 2015 at 9:00 a.m. in 302 Steele Hall." (*Id.* at 178). The letter goes on to explain:

> [P]er section 10.6 of the University Conduct System Handbook, you may participate in a pre-hearing meeting to review the hearing process. Please contact the [OSRR] at 315.443.3728 to schedule an appointment prior to the hearing. If you have an advisor assisting you with the conduct process, your advisor may attend the pre-hearing meeting as well.

(*Id.* at 179). The letter closes by instructing Plaintiff to "refer to the [Handbook], which is included below, for all applicable procedures" and to "contact this office" with "any questions regarding this process." (*Id.*).

The hearing on Student X's complaint against Plaintiff was held before the UCB on September 10, 2015, and although Plaintiff failed to make a timely request to be heard, she was allowed to address the UCB. (*Id.* ¶ 41). Thereafter, the UCB issued an opinion finding Plaintiff responsible for violating five sections of the Code of Student Conduct, (*id.* ¶ 42):

> Based on evidence presented by both [Student X] and [Plaintiff], there [was] an established pattern demonstrating that [Plaintiff] harassed and stalked [Student X] directly and indirectly through friends, family and ex-girlfriends. Further, due to this harassment, [Student X] has had a reduced quality of life, [suffered] stress and worry for his personal safety and his future career. Specifically, [Plaintiff] threatened [Student X's] career in the Facebook conversation with his mother stating if she filed a police report, "He might not be able to practice the law he loves so much." It is the belief of this Board that [Plaintiff's] statement provided to the Syracuse University Title IX Coordinator and this Board include[] falsified facts and altered text messages as well as a text message conversation in which text messages were intentionally omitted. The culmination of [Plaintiff's] actions has alienated [Student X] from his family, church, friends, and community.

(*Id.* ¶ 43; *id.* at 187).

Citing Plaintiff's "pattern of continuous and escalating behavior of misrepresentation, manipulation, harassment, and the threatening of others," the UCB recommended expulsion. (*Id.* ¶ 44; *id.* at 187). By letter, dated September 15, 2015, Plaintiff was expelled from the University "effective immediately." (*Id.* ¶ 42; *id.* at 190–91).

On September 15, 2015, Plaintiff appealed the UCB's decision. (*Id.* ¶ 45; *id.* at 193). Plaintiff's appeal was received by the OSRR on September 22, 2015. (*Id.* ¶¶ 45–46; *id.* at 197–201). The University Appeals Board conducted a hearing and review of the UCB's opinion on October 2, 2015, and thereafter sustained the UCB's decision. (*Id.* ¶ 48; *id.* at 204–05).

## III.    STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a

summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aero., Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

Where the plaintiff proceeds pro se,[4] the Court must read her submissions liberally and interpret them "to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). However, a pro se party's "'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Jordan v. New York*, 773 F. Supp. 2d 255, 268 (N.D.N.Y. 2010) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)); *see also Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011).

## IV.   STATEMENT OF MATERIAL FACTS

Before turning to the merits, the Court must address Plaintiff's failure to respond to the factual allegations set forth in Defendant's statement of material facts. Rule 56(c)(1)(A) requires

---

[4] Defendant asserts that "Plaintiff clearly is represented by ghost counsel" and "should not receive any 'special solicitude' provided by courts to pro se plaintiffs." (Dkt. No. 121, at 4). But Defendant does not substantiate this assertion by citing to the record or relevant case law.

that a "party asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute." Under Rule 56(e), if a party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may," inter alia, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3). Similarly, N.D.N.Y. Local Rule 56.1(b) requires that that each denial in a response to a statement of material facts "set forth a specific citation to the record where the factual issue arises," and provides that "[t]he Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."

A court has discretion to deem facts admitted or grant summary judgment in accord with Rule 56(e)(2), (3), and the court's local rules, but is not required to do so. *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."); *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."). The Court "may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file" a Local Rule 56.1 statement. *Id.*; *see also* Advisory Committee Notes to 2010 Amendment to Fed. R. Civ. P. 56 (noting that when a party "fails to properly address another party's assertion of fact as required by Rule 56(c)," "the court may choose not to consider the fact as undisputed, particularly if the court knows of record materials that show grounds for genuine dispute," and that "the court may seek to reassure itself

by some examination of the record before granting summary judgment against a pro se litigant"); Fed. R. Civ. P. 56(c)(3) (noting that the court "may consider other materials in the record," beyond the cited materials).

Defendant acknowledges in its reply brief that it failed to annex a copy of the United States District Court, Northern District of New York "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion" to its motion for summary judgment, as required by the Local Rule 56.2. (Dkt. No. 121, at 4). But a copy of the required notice was filed on the docket and served upon Plaintiff by regular mail on January 18, 2024, two days after Defendant filed its motion. (Dkt. No. 107). Despite this warning, Plaintiff has not responded directly to Defendants' statement of material facts with evidentiary proof and instead relies largely on statements in her memorandum of law or references to the complaint, both of which are unsworn.

However, "as the Second Circuit has made clear [that] 'special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment," and because "'the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions,'" *Hamm v. Hatcher*, No. 05-cv-503, 2013 WL 71770, at *6, 2013 U.S. Dist. LEXIS 2203, at *18–19 (S.D.N.Y. Jan. 7, 2013) (internal citations omitted) (first quoting *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); and then quoting *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009)), the Court has considered the complaint and exhibits to Plaintiff's opposition memorandum of law, to the extent Plaintiff relies on them in her memorandum. Nonetheless, while mindful of Plaintiff's status as a pro se litigant, because Plaintiff received "adequate notice that [s]he needed to submit affidavits or other admissible evidence to create a genuine factual dispute on his claims," the

Court accepts Defendant's version of the facts where Plaintiff has not properly supported her factual allegations. *See Salahuddin v. Goord*, 467 F.3d 263, 278 (2d Cir. 2006) (accepting the defendant's "version of events" where the pro se plaintiff "received adequate notice that he needed to submit affidavits or other admissible evidence to create a genuine factual dispute on his claims," but pointed "only to his unsworn complaint to dispute [the defendant's] version of events").

## V.    DISCUSSION

Plaintiff's remaining claims are: (1) breach of contract based on Defendant's alleged failure to invite Plaintiff to participate in a pre-hearing meeting in violation of the Handbook; (2) breach of contract based on Defendant's alleged failure to resolve her claim of sexual assault in violation of the Handbook; and (3) deliberate indifference to harassment in violation of Title IX. *Syracuse Univ.*, 2022 WL 798058, at *13–14, 2022 U.S. Dist. LEXIS 47053, at *36–37. Defendant seeks summary judgment on all three claims. (Dkt. No. 106-1, at 6).

### A.    Breach of Contract – Notice of Pre-Hearing Meeting

The elements of a breach of contract claim in New York are: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." *Habitzreuther v. Cornell Univ.*, No. 14-cv-1229, 2015 WL 5023719, at *5, 2015 U.S. Dist. LEXIS 112209, at *13–14 (N.D.N.Y. Aug. 25, 2015) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)). Under New York law, "an implied contract is formed when a university accepts a student for enrollment: if the student complies with the terms prescribed by the university and completes the required courses, the university must award [her] a degree." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (citing *Carr v. St. John's Univ.*, 17 A.D.2d 632, 633 (2d Dep't), *aff'd*, 12 N.Y.2d 802 (1962)). The terms of the implied contract are

"contained in the university's bulletins, circulars and regulations made available to the student." *Id.* (quoting *Vought v. Teachers Coll., Columbia Univ.*, 127 A.D.2d 654, 654 (2d Dep't 1987)). "Implicit in the contract is the requirement that the institution 'act in good faith in its dealing with its students.'" *Id.* (quoting *Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 413–14 (1980)). At the same time, "the student must fulfill [her] end of the bargain by satisfying the university's academic requirements and complying with its procedures." *Id.* (quoting G*ally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998)).

Plaintiff's first breach of contract claim is based on her allegation that Defendant failed to provide her with a pre-hearing meeting in violation of Section 10.6 of the Handbook, (Dkt. No. 1, ¶¶ 72–74), which provides, as part of the "Overview of the Conduct Process for Cases Involving Sexual Assault, Stalking, Gender-Related Harassment and Domestic/Relationship Violence," that "[b]oth the complainant and respondent will be invited to participate in an individual pre-hearing meeting in the [OSRR] to review the hearing process, but neither the complainant nor the respondent are required to attend," (Dkt. No. 106-3, at 34).

Defendant argues that this claim is subject to summary judgment because the documentary evidence establishes that Plaintiff "received a letter from the University's Ryan Gavigan dated September 1, 2015, that included language inviting her to a pre-hearing meeting in advance of her hearing scheduled for September 10, 2015." (Dkt. No. 106-1, at 9). Plaintiff appears to respond that she did not receive the September 1, 2015 letter. (Dkt. No. 119, ¶¶ 6–9). She contends that she did not agree, at her deposition, that she received it: "[s]he only validated that she could read the sentences in the letters by answering 'yes'" and acknowledged that the letter was "written from the sender, Mr. Gavigan, to the receiver, Plaintiff." (*Id.* ¶ 6). She contends further that she "clearly stated 'I do not recall'" when asked if she recalled the

September 1, 2015 letter and that she "mistakenly stated yes to the Defendants' attorney's question" because her translator did "not translate the sentences." (*Id.* ¶¶ 6–7). However, Plaintiff's response is contained in an unsworn memorandum of law and Plaintiff cites no record evidence in support of her position.

Defendant cites evidence showing that Mr. Gavigan emailed Plaintiff on September 1, 2015, and that attached to Mr. Gavigan's email was a letter dated September 1, 2015. (Dkt. Nos. 106-6, ¶ 86; 106-3, ¶ 36; 106-3, at 178–79). The letter unequivocally invites Plaintiff to a pre-hearing meeting to review the hearing process, (Dkt. No. 106-3, at 178–79 ("This is to inform you that the [UCB] will hear the complaint filed against you by [Student X]. . . . [P]er section 10.6 of the University Conduct System Handbook, you may participate in a pre-hearing meeting to review the hearing process. Please contact the [OSRR] . . . to schedule an appointment prior to the hearing."), and provides Plaintiff with information concerning her rights and obligations, (*see id.* ("[R]efer to the [Handbook], which is included below, for all applicable procedures" and "contact this office" with "any questions regarding this process.").

At her deposition, Plaintiff was asked twice whether she received Mr. Gavigan's September 1, 2015 email. (Dkt. No. 106-2, at 162:12–13 ("Do you recall receiving Deposition Exhibit Number 10 on September 1st, 2015?"); *id.* at 165:12–15 ("So just reviewing again – so having reviewed this now you would agree that you received the letters and email from Mr. Gavigan as reflected in Deposition Exhibit Number 10 on September 1st, 2015, right?")). Plaintiff responded both times in the affirmative. (*Id.* at 162:14–15; 165:16). She also confirmed that Mr. Gavigan's email was sent to an email address belonging to her and that "there was an attached letter that you would access by clicking on the icon for pick up your letter." (*Id.* at 162:16–19).

As a result, notwithstanding the special solicitude afforded pro se litigants, Plaintiff's unsworn assertions concerning whether Defendant provided a pre-hearing meeting are insufficient to create an issue of material fact. Thus, the Court agrees with Defendant that "there is no dispute that Plaintiff received the September 1, 2015 letter" and that "[the September 1, 2015] letter invited Plaintiff to participate in a pre-hearing meeting." (Dkt. No. 106-1,at 10). Defendant's motion for summary judgment is therefore granted as to this claim.

### B.      Breach of Contract – Failure to Resolve Plaintiff's Complaint

Plaintiff's second breach of contract claim is based on her allegation that Defendant failed to adjudicate her sexual assault complaint against Student X. (Dkt. No. 1, ¶¶ 57–58). Earlier in this case, Plaintiff argued in opposition to Defendant's motion to dismiss that, after investigators reviewed her allegation of sexual assault against Student X, her claim was "amalgamated" with Student X's claim and then "essentially disappeared." (Dkt. No. 54, at 8; *see id.* at 9 ("It's not clear where Plaintiff's claim went from there.")). Plaintiff argued that under Defendant's policies investigators "cannot decide the merits of sexual assault claims" and are required to provide a report containing the facts learned during the investigation. (*Id.* at 8–9). In reply, Defendant argued that Plaintiff's complaint does not allege any facts in this regard and encouraged the Court to disregard the facts asserted for the first time in Plaintiff's opposition. (Dkt. No. 57, at 11–12).

In its March 16, 2022 decision, the Court wrote:

> In deference to Plaintiff's pro se status, the Court will consider allegations in Plaintiff's opposition to the extent they are consistent with the allegations in the complaint. *See Crum*, 562 F. Supp. 2d at 373–74 & n.13. Moreover, Plaintiff's complaint alleges that Defendant failed to provide an investigation in accordance with "its own policy," which "requires [it] to describe facts surrounding claims;" that "Defendant's police office closed the case;" and that the investigator's report only considered Student X's complaint. (Dkt. No. 1, ¶¶ 64, 68, 70).

*Syracuse Univ.*, 2022 WL 798058, at *8, 2022 U.S. Dist. LEXIS 47053, at *22. The Court

concluded that Plaintiff had plausibly alleged that her Title IX complaint was not resolved in

accord with Sections 10.7, 10.8, and 10.10 of the Handbook[5] and allowed her breach of contract

claim to proceed on that basis. *Id.* at 2022 WL 798058, at *9, 2022 U.S. Dist. LEXIS 47053, at

*23.

 Defendant "agrees that Plaintiff's sexual assault claim against Student X did not proceed

past the time Ms. Johnson-Willis issued her memorandum dated August 13, 2015," but moves

for summary judgment on this claim "because the University no longer had jurisdiction over

Student X when Plaintiff complained about him on June 25, 2015, as he had already graduated

from the College of Law, and therefore was no longer a 'student' subject to the Handbook and its

student conduct process." (Dkt. No. 106-1, at 11–12).

> [B]ecause the University and its Student Conduct System did not have jurisdiction
> over Student X pursuant to the specific terms of the handbook, the University had
> no basis to proceed with Plaintiff's complaint against Student X. And because the
> University had no basis to proceed with Plaintiff's complaint against Student X, the
> University did not violate Sections 10.7, 10.8 or 10.10 of the Handbook: there was
> no "conclusion regarding responsibility for violations of the Code of Student
> Conduct" to be made; there was no report to provide to the UCB, and there was no
> investigation to complete within sixty days.

(*Id.* at 13).

 As an initial matter, the University's jurisdiction is limited by the terms of the Handbook

and does not appear to extend to former students. Section 2.1 of the Handbook provides: "The

University Student Conduct System has jurisdiction over all alleged violations of the Code of

---

[5] Section 10.7 of the Handbook provides: "The investigator will provide the alleged Code of Student Conduct violations, the written report, and the [complainant's and respondent's] written responses to a three-member [UCB]." (Dkt. No. 106-3, at 34). After describing what the investigator's report must include, Section 10.7 continues: "The report will not include any conclusions regarding responsibility for violations of the Code of Student Conduct." (*Id.* at 34–35). Under Section 10.8, "the board will determine whether it is more likely than not that the respondent violated the Code of Student Conduct." (*Id.* at 35). And, under Section 10.10, "[t]he process of investigation and the Board's decision will be concluded within 60 days of the original complaint, pending special circumstances." (*Id.*).

Student Conduct by any student or recognized student organization that may be brought to its attention." (Dkt. No. 106-3, at 25; *see also id.* at 24 (Section 1.1 of the Handbook states that "[t]he Trustees and Chancellor of Syracuse University have delegated authority to the University Student Conduct System to adjudicate cases alleging violations of the Code of Student Conduct by Syracuse University students."). This limited jurisdiction is reflected in the sanctions available to the University for violations of the Code of Student Conduct and related University policies, which may only be applied to "any individual student, group of students, or student organization." (*Id.* at 36). Therefore, the question is whether Plaintiff has raised a dispute of material fact by responding that "[t]he University was aware of [Plaintiff's sexual assault allegations] while Student X was enrolled" because Plaintiff "called Syracuse Counseling Center on May 5, 2015, and Dr. Brown . . . was assigned to provide the advocate on May 7, 2015." (Dkt. No. 119, ¶¶ 11, 14). She has not.

Even crediting Plaintiff's deposition testimony that she told Dr. Brown on May 5, 2015, of the alleged sexual assault—which Dr. Brown denies[6]—this would not be a sufficient basis from which a reasonable factfinder could conclude that *Defendant* had actual knowledge of these allegations because Dr. Brown was not an "appropriate person" under Title IX or for purposes of reporting a violation of the University's Code of Conduct. *See Papelino*, 633 F.3d at 89 (explaining, in the context of a Title IX claim, that a school has actual knowledge of harassment when a school official with "authority to address the alleged discrimination and to institute corrective measures" has actual knowledge of the discrimination.).

---

[6] Dr. Brown states in her declaration that "Plaintiff did not tell me on May 5, 2015 that Student X sexually assaulted her; in fact, I did not learn about this until after I returned to the office on July 2, 2015." (Dkt. No. 106-5, ¶ 7).

In 2015, Dr. Brown was a Staff Therapist with the University's Counseling Center assigned to the University's SRVR Team. (Dkt. No. 106-5, ¶ 1–2, 5). SRVR Team Therapists "provided assistance to students who reported sexual and relationship violence as well as sexual and relationship harassment," but did not "make recommendations on how a student should proceed with respect to reporting a sexual assault or in advocating on their behalf through the Title IX process." (*Id.* ¶ 5). Crucially, under the Counseling Center's Privacy and Confidentiality Policy, SRVR Team Therapists like Dr. Brown "did not have the authority to initiate Title IX complaints or a disciplinary process." (*Id.* ¶ 4). The policy expressly states that "[t]hese individuals are neither required nor permitted to provide any information regarding an incident of sexual assault or relationship violence to any outside party without the consent of the student involved in the incident" and, in particular, "will not provide any information about a reported incident of sexual assault or relationship violence to the [] University Title IX Coordinator or any law enforcement agency without the student's permission." (*Id.* at 10). There is no evidence that Plaintiff instructed Dr. Brown at their May 5, 2015 meeting to provide information regarding the alleged sexual assault to the University's Title IX Coordinator. And from Dr. Brown's notes it appears no such instruction was given. (Dkt. No. 119-3, at 2).

By contrast, Defendant has submitted a January 12, 2024 declaration by Ms. Johnson-Willis, who in 2015 was an EOIRS Investigator and the University's Interim Chief Equal Opportunity Title IX Officer. (Dkt. No. 106-4, ¶ 1). Ms. Johnson-Willis states that "[t]he first time Plaintiff complained to the Title IX/EOIRS office that she had been sexually assaulted by Student X was when she met with me on June 25, 2015," by which time Student X had graduated. (*Id.* ¶ 25). Defendant has also submitted a January 12, 2024 declaration by the University's Title IX Coordinator for Students, Pamela Peter, who was, during the relevant

17

period, the Director of the OSRR. (Dkt. No. 106-3, ¶ 1). In her declaration, Ms. Peter explains

that as part of the investigation into Student X's complaint against Plaintiff, then-Title IX

Coordinator Cynthia Maxwell Curtin emailed Plaintiff on June 19, 2015, to schedule a time to

discuss Student X's allegations. (*Id.* ¶¶ 15–16). On June 25, 2015, Plaintiff appeared at Ms.

Maxwell Curtin's office with Ms. Watson, a Counseling Center Therapist, where they met with

Ms. Johnson-Willis. (*Id.*). Ms. Peter states that "[d]uring this meeting, and for the first time,

Plaintiff reported that she had been sexually assaulted by Student X." (*Id.*).

Plaintiff has failed to raise a triable issue of material fact as to whether Defendant had

actual knowledge of the alleged sexual assault prior to Student X's May 8, 2015 graduation.

There is no evidence that Dr. Brown could have initiated a complaint on Plaintiff's behalf

without her consent. And by June 25, 2015, when Plaintiff filed a complaint with Defendant's

Title IX office, Student X was no longer a student subject to the University's jurisdiction.

Consequently, no reasonable factfinder could conclude that Defendant violated its own policies

by failing to adjudicate Plaintiff's sexual assault complaint. Summary judgment must therefore

be granted in Defendant's favor on this claim.[7]

### C.    Title IX – Harassment

Finally, Plaintiff alleges a Title IX harassment claim. Specifically, Plaintiff alleges that,

no later than June 25, 2015, the University had actual knowledge of severe and pervasive

harassment by virtue of her Title IX complaint against Student X for sexual assault. (*See* Dkt.

---

[7] The Court notes that the Handbook does not mandate that there be an investigation or describe procedures applicable to a decision not to investigate. Section 10.4 states, inter alia, that, "[u]pon the receipt of a complaint, the Title IX Coordinator will designate an investigator who *may* conduct an investigation." (Dkt. No. 106-3, at 34 (emphasis added)). Since this issue was not briefed, however, the Court has focused its discussion on the jurisdictional issue that was. The Court also notes Defendant's observation that Plaintiff cites in her response not to the Handbook but to a 2020 Title IX regulation, 34 C.F.R. § 106.45(b)(3)(ii), which affords schools the discretion to dismiss a Title IX "complaint or any allegations therein, if at any time during the investigation . . . the respondent is no longer enrolled." (Dkt. No. 121, at 7 (quoting Dkt. No. 119 ¶ 12)).

No. 1, ¶¶ 57 (alleging that she "filed a complaint" with the University's Title IX officer "that her ex-boyfriend had sexually assaulted her" on June 25, 2015), 68 (alleging that Officer Patsos "insulted Plaintiff by saying that her lack of English proficiency caused misunderstanding of 'consent' during a consen[sual] sexual intercourse").

Title IX provides, with certain exceptions not relevant here: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Sexual harassment is a "form of discrimination prohibited by Title IX." *Posso v. Niagara Univ.*, 518 F. Supp. 3d 688, 696 (W.D.N.Y. 2021) (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 649–50 (1999)). To establish a "student-on-student sexual harassment Title IX claim," a plaintiff must demonstrate that "(1) a federally funded educational institution (2) was deliberately indifferent to and (3) had actual knowledge of (4) sexual harassment that was so severe, pervasive, and objectively offensive that it could be said to have deprived the plaintiff of access to the educational opportunities or benefits." *Roskin-Frazee v. Columbia Univ.*, No. 17-cv-2032, 2018 WL 6523721, at *4, 2018 U.S. Dist. LEXIS 28937, at *11 (S.D.N.Y. Nov. 26, 2018) (citing *Davis*, 526 U.S. at 650); *Posso*, 518 F. Supp. 3d at 696 (same). In this case, Defendant moves for summary judgment, arguing, among other things, that Plaintiff has failed to adduce evidence showing actual knowledge, deliberate indifference, or deprivation of educational opportunities. (Dkt. No. 106-1, at 19–29).

Beginning with the last element, a plaintiff must show "sexual harassment that was so severe, pervasive, and objectively offensive that it could be said to have deprived the plaintiff of access to the educational opportunities or benefits." *Roskin-Frazee*, 2018 WL 6523721, at *4,

2018 U.S. Dist. LEXIS 28937, at *11 (citing *Davis*, 526 U.S. at 650). To determine whether harassment rises to this level, "courts consider whether the harassment 'had a concrete, negative effect' on the plaintiff's 'ability to receive an education.'" *Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 367 (S.D.N.Y. 2017) (quoting *Davis*, 526 U.S. at 654). "Examples of such negative effects include a drop in grades, missing school, being forced to transfer schools, or mental health issues requiring therapy or medication." *Id.* at 368 (citing *Davis*, 526 U.S. at 652). As the Court observed in its March 16, 2022 decision, "a 'single event' of harassment can satisfy the severe and pervasive standard if it is 'sufficiently threatening or repulsive, such as a sexual assault.'" *Syracuse Univ.*, 2022 WL 798058, at *13, 2022 U.S. Dist. LEXIS 47053, at *35 (quoting *T.Z. v. City of New York*, 634 F. Supp. 2d 263, 270–71 (E.D.N.Y. 2009) (collecting cases)).

It may be, in this case, that Plaintiff has satisfied the deprivation of educational opportunities element of her Title IX claim. Plaintiff reported that she had been sexually assaulted by Student X "throughout the course of [her] dating relationship [with Student X]." (Dkt. No. 106-3, at 96). And Plaintiff has submitted an email chain with a professor at the University that suggests her academic performance suffered as a result, (*see* Dkt. No. 119-11, at 2–3)—though it does not support the assertion that she "received all A in her graduate school however her grade became C or lower for the summer class in 2015," (Dkt. No. 119, at 16). The Court need not decide whether Plaintiff's thin evidentiary showing is sufficient to raise a genuine dispute of material fact as to this element, however, because either way Plaintiff has failed to show actual knowledge or deliberate indifference.

"For an educational facility to be liable . . . [a] plaintiff must establish that a school official with 'authority to address the alleged discrimination and to institute corrective measures'

had 'actual knowledge' of the discrimination and failed to respond." *Papelino*, 633 F.3d at 89

(quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)); *see also Gebser*, 524

U.S. at 290 ("[W]e hold that a damages remedy will not lie under Title IX unless an official who

at a minimum has authority to address the alleged discrimination and to institute corrective

measures on the recipient's behalf has actual knowledge of discrimination in the recipient's

programs and fails adequately to respond."). A school may be liable for deliberate indifference

only where "the harasser is under the school's disciplinary authority." *Davis*, 526 U.S. at 646–

47.

      Construing the facts in the light most favorable to Plaintiff, Plaintiff has not, as the Court

has explained, shown that a school official with authority to address the alleged sexual assault

had actual knowledge of the alleged assault prior to Student X's May 8, 2015 graduation. Even

crediting the disputed assertion that Plaintiff informed Dr. Brown of the allegations at their May

5, 2025 meeting, there is no evidence that Dr. Brown had any authority to address Plaintiff's

complaint or institute corrective measures. Further, the evidence indicates that Student X had

graduated by the time Plaintiff filed a complaint with Defendant's Title IX Office on June 25,

2015, and Defendant no longer had the authority to take remedial action. *See Davis*, 526 U.S. at

644 ("A recipient cannot be directly liable for its indifference where it lacks the authority to take

remedial action."). Thus, Plaintiff has failed to satisfy the actual knowledge element of her Title

IX claim.

      "A defendant acts with deliberate indifference for Title IX purposes 'when the

defendant's response to known discrimination is *clearly* unreasonable in light of the known

circumstances.'" *Roskin-Frazee*, 2018 WL 6523721, at *4, 2018 U.S. Dist. LEXIS 28937, at *11

(emphasis in original) (citing *Gant ex rel. Gant v. Wallingford Bd. Of Educ.*, 195 F.3d 134, 141

(2d Cir. 1999)). "The clearly unreasonable standard requires more than mere negligence; 'it is a high standard that seeks to eliminate any risk that an educational institution would be liable in damages not for its own official decision but instead for [another individual's] independent actions.'" *Posso*, 518 F. Supp. 3d at 697 (quoting *Roskin-Frazee*, 2018 WL 6523721, at *4, 2018 U.S. Dist. LEXIS 28937, at *12). Deliberate indifference must, "at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *KF ex rel. CF v. Monroe Woodbury Centr. Sch. Dist.*, No. 12-cv-2200, 2013 WL 177911, at *6, 2013 U.S. Dist. LEXIS 7269, at *15–16 (S.D.N.Y. Jan. 16, 2013) (quoting *Davis*, 526 U.S. at 645). The "measures taken must be so inadequate that a degree of discriminatory intent may be inferred." *Id.* (citations omitted). For instance, a complete failure to respond to a complaint of harassment can constitute deliberate indifference. *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (2d Cir. 2012).

Plaintiff has not met this standard either. During their initial June 25, 2015 meeting, Ms. Johnson-Willis advised Plaintiff on the University's processes for responding to sexual assault and interviewed Plaintiff regarding her allegations. (Dkt. No. 106-4, ¶ 11). Ms. Johnson-Willis informed Plaintiff that because Student X had graduated "the University did not have jurisdiction over him under the University's student conduct system," and explained to Plaintiff "the criminal process and how to make a criminal report with the [SPD]." (*Id.* ¶ 12). Ms. Johnson-Willis later memorialized their meeting in a four-page interview report. (*See id.* at 43–47). The following day, after two SPD officers met with Plaintiff but declined to "take her complaint," Ms. Johnson-Willis told Plaintiff how to file a complaint against the officers and how she could obtain an order of protection against Student X. (*Id.* ¶ 13). Consequently, Plaintiff has failed to present evidence from which a factfinder could conclude that Defendant's response to Plaintiff's June 25, 2015 complaint was clearly unreasonable in light of the circumstances. *See Tubbs v. Stony*

*Brook Univ.*, 343 F. Supp. 3d 292, 309 (S.D.N.Y. 2018) (granting summary judgment and observing that "[the deliberate indifference standard] requires only that school administrators respond to known peer harassment in a manner that is not clearly unreasonable in light of the known circumstances."); *see also Oden v. Northern Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006) (affirming summary judgment where a nine-month delay in convening a hearing violated the college's policy requiring a hearing within thirty days of a formal complaint but did not amount to deliberate indifference).

In sum, Plaintiff has failed to establish a prima facie Title IX claim. Defendant's motion for summary judgment is therefore granted as to this claim.

## VI.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion for summary judgment, (Dkt. No. 106), is **GRANTED** and Plaintiffs' complaint, (Dkt. No. 1), is **DISMISSED** with prejudice; and it is further

**ORDERED** that the Clerk serve a copy of this Order on the parties in accordance with the Local Rules; and it is further

**ORDERED** that the Clerk is directed to close this case.

**IT IS SO ORDERED.**

Dated: <u>July 24, 2024</u>
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

23